-¶PS-O-

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

EDDIE GOMEZ, OLGA PADILLA,
ELIZABETH PADILLA,

                  Plaintiffs,

      -v-

STANLEY SEPIOL, A. MUCIGROSSO, A. FUSARE,
ATWOOD, ROPE, VIRGINIA LIVERMORE,
W. HUGHES, STEVEN RACETTE, RAYMOND J. COVENY,
ROBERT PRACK, PATRICK GRIFFIN, MICHAEL SHEAHAN,
HARRY HETRICK, MARC D. MACGRAIN, SCOTT M. HODGE,
RICHARD T. ORIOLES, THOMAS EVANS, DOUGLAS REYNOLDS,
SABRINA VON HAGN, ELIZABETH . WHITE, JOHN DOE 1,
JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JOHN DOE 5,
JOHN DOE 6, JOHN DOE 7, ANGELA BARTLETT,
KATHLEEN WASHBURN, JANE GRAY, JOHN DOE 8,
JOHN DOE 9, JOHN DOE 10, JOHN DOE 11,
JOHN DOE 12, BRIAN FISCHER, ANDREW S. PEDALTY,
KAREN BELLAMY, PETER S. SCHMITT, STEVE F. POST,
MARK DEBURGOMASTER, STEVEN WENDERLICH,
PAUL SWEENEY, HAROLD GRAHAM, JOHN DOE 13,
JOHN DOE 14, SIGNOR, STEVEN J. EVERTTS,
sued individually and in their official
capacities

               Defendants.

11-CV-1017Sr

**ORDER**



## INTRODUCTION

    Plaintiffs, Eddie Gomez, currently an inmate at the Wende Correctional facility, who was an inmate at the Elmira and Southport Correctional Facilities at the time of the events alleged in the complaint, and Olga and Elizabeth Padilla, Gomez's wife and stepdaughter, respectively, filed, *pro se*, a complaint under 42 U.S.C. § 1983 alleging a number of claims (Eight) against a number of defendants (34), including a number of John Does, who are or

were supervisory officials and/or employees of the New York State Department of Corrections and Community Supervision ("DOCCS"). Plaintiffs allege, <u>inter alia</u>, that defendants violated their constitutional rights in a myriad of ways, including but not limited to, a conspiracy to retaliate against Gomez for the filing of numerous grievances, complaints and other court actions while he was at Southport, a violation of Gomez's due process rights during disciplinary hearings and interference with plaintiffs' mail when Gomez was at Southport.  (Docket No. 1, Complaint.)

Each plaintiff has been granted permission to proceed *in forma pauperis* (Docket No. 8), and each has now signed the complaint or submitted a signed signature page, as directed by the Court.[1] (Docket Nos. 8, 10).  The complaint must now be screened pursuant to 28 U.S.C. § § 1915(e)(B) and 1915A.  For the reasons discussed below, several of plaintiffs' claims are dismissed with prejudice, pursuant to 28 U.S.C. §§ 1915(e)(2)(ii) and 1915A(b).  The

---

[1]It appeared that the complaint and separate verification pages had been signed by Gomez only on behalf of all three plaintiffs and, therefore, the Court directed each plaintiff to submit a declaration declaring under oath that they each separately read and signed the complaint.  (Docket No. 8.)  Each plaintiff, as directed, submitted declarations stating that Gomez signed the complaint and verification page on Olga and Elizabeth Padilla's behalf after the two Padillas authorized him to do that because of the need to file the complaint on a timely basis.  (Docket Nos. 9-10.)  The Court, therefore, finds that plaintiffs have shown cause as directed by the Court.  (Docket No. 8.)  Each plaintiff is reminded however that they must each act on their own in this litigation and one cannot act on behalf of another *pro se*.  See <u>Iannacone v. Law</u>, 142 F.3d 553, 558 (2d Cir.1998) Each plaintiff must sign each pleading and be actively involved in the prosecution of this litigation.  Any plaintiff not prepared to do that should withdraw voluntarily as a party to this action.

remaining claims will proceed to service by the United States
Marshals Service.  *See* *id.*, § 1915(d); Fed.R.Civ.P. 4(c)(3).

## DISCUSSION

Sections 1915(e)(2)(B) and 1915A(a) of 28 U.S.C. require the
Court to conduct an initial screening of the complaint.  In
evaluating the complaint, the Court must accept as true all of
the factual allegations and must draw all inferences in
plaintiffs' favor.  *See* Larkin v. Savage, 318 F.3d 138, 139 (2d
Cir. 2003) (per curiam); King v. Simpson, 189 F.3d 284, 287 (2d
Cir. 1999). While "a court is obliged to construe [*pro se*]
pleadings liberally, particularly when they allege civil rights
violations," McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir.
2004), even pleadings submitted *pro se* must meet the notice
requirements of Rule 8 of the Federal Rules of Civil Procedure.
Wynder v. McMahon, 360 F.3d 73 (2d Cir. 2004).  "Specific facts
are not necessary," and the plaintiffs "need only 'give the
defendant fair notice of what the ... claim is and the grounds
upon which it rests.' " Erickson v. Pardus, 551 U.S. 89, 93
(2007) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555
(2007) (internal quotation marks and citation omitted).

A complaint must plead "enough facts to state a claim to
relief that is plausible on its face." Twombly, 550 U.S. at 570.
A claim will be considered plausible on its face "when the
plaintiff pleads factual content that allows the court to draw

3

the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). Although a *pro se* complaint must contain sufficient factual allegations to meet the plausibility standard, it is held to less stringent standards than pleadings drafted by lawyers, *see* Erickson, 551 U.S. at 94, and the court is obliged to construe plaintiffs' pleadings liberally and interpret them as raising the strongest arguments they suggest. *See* Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994).

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983. "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." Whalen v. County of Fulton, 126 F.3d 400, 405 (2d. Cir. 1997) (citing Eagleston v. Guido, 41 F.3d 865, 875-76 (2d Cir.1994)). Based on its evaluation of the complaint, the Court finds that several of plaintiffs' claims must be dismissed with prejudice, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), because they fail to state a claim upon which relief may be granted. In addition, the Court finds that the remaining claims may proceed to service.

A.   PLAINTIFFS' CLAIMS[2]

The complaint is 61 pages in length and includes 184 separate exhibits, comprising 327 pages.  It contains 215 separate paragraphs, is brought against 34 defendants and asserts eight separate claims for relief under various amendments to the United State Constitution and state law.  The claims for relief are asserted against numerous defendants, many of whom are supervisory and non-supervisory officials who are not alleged to have been personally involved in the constitutional deprivations alleged.  For example, many defendants are alleged to be liable simply in their capacities as supervisory officials or members of the Central Office Review Committee ("CORC") or Inmate Grievance Review Committees ("IGRC") who were involved in reviewing grievances or appeals from the denials of grievances filed by plaintiff--e.g., former DOCCS Commissioner Fischer, Superintendent Griffin, Deputy Superintendents Bartlett and Sheahan, John Does 1-5 (CORC Members) and John Does 6-13, Von Hagn and White (IGRC Members or IGRC Supervisors at Southport).

---

[2]In light of the procedural posture of this case, initial review pursuant to 28 U.S.C. § § 1915(e)(2)(B) and 1915A(b), the recitation of facts is drawn exclusively from plaintiff's complaint, the contents of which must be accepted as true for purposes of this review.  *See* Erickson, 551 U.S. at 93-94 (citing Bell Atlantic Corp., 550 U.S. at 555-56).

The Court will review each of the eight claims for relief below separately, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A.[3]

1.  <u>First Claim: Harassment and Retaliation for Filing Grievances, Complaints and Other Actions</u>

The gravamen of Gomez's[4] claims is that in 2008 and 2009, prior to his transfer from Southport to Elmira on May 4, 2009, he had filed numerous grievances and administrative complaints against a number of DOCCS officials and employees at Southport, including defendants Sepiol and Livermore, and a N.Y.C.P.L.R. Article 78 proceeding against former Commissioner Fischer and a former Southport Superintendent (Napoli) relating to the disclosure of certain records relating to an incident that

_____

[3]The Court notes the tension between its obligations to enforce the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure and "to read[] *pro se* complaints with special solicitude and [to] interpret[] them to raise the strongest [claims] that they *suggest*." Shomo v. New York, 374 Fed. Appx. 180, 183 (2d Cir. 2010) (internal quotation marks and citation omitted). The Rule 8 "violations" in the instant complaint, however--e.g., short and plain statement--are not of the type that would allow the Court to dismiss the complaint *in toto* with leave to amend to comply with Rule 8, Shomo, 374 Fed. Appx. at 183 (complaint is neither "unintelligible" nor a "labrynthian prolixity of unrelated and vituperative charges that defied comprehension") (quoting Prezzi v. Schelter, 469 F.2d 691, 692 (2d Cir.1972)).  Accordingly, the Court is therefore charged with the oft-time burdensome task of reviewing each claim against each of the 34 defendants and to determine whether said claims are frivolous, malicious, fail to state a claim upon which relief can be granted, or seek relief against defendants entitled to immunity, *see* 28 U.S.C. §§ 1915(e)(2)(B) and 1915A; *see also* Shomo, 374 Fed.Appx. at 183 (district court's dismissal on the basis of § 1915(e) was in error, because [it] did not review, in fact, the merits of plaintiff's claims to determine whether they were frivolous under the relevant civil rights statute . . . .") and, if so, whether the claims can be dismissed *sua sponte* or cured by amendment.

[4]Because the vast majority of the allegations involve Gomez only, when "plaintiff" is used herein it refers to Gomez only, unless noted otherwise.

occurred at Southport on June 14, 2008.[5]  Gomez claims that he assumed that Fischer and Napoli would not disclose the records despite a state court order requiring them to do so and he thus served on June 17, 2010, an "amended demand" for the preservation of evidence on Napoli and Southport's then Deputy Superintendent for Security, Colvin.  (Complaint, ¶¶ 52-55.)  On July 27, 2010, more than 30 days after the time to comply with the court order had elapsed, Gomez wrote to then Attorney General Andrew Cuomo and indicated that "unless he received the records . . . he intended to file a motion to compel compliance and to ask the state court to hold Fischer and Napoli in contempt . . . ." (*Id.*, ¶ 55.)  A copy of the letter was also forwarded to Fischer and Napoli.

Plaintiff then alleges, upon information and belief, that service of the demand on Fischer and Colvin "prompted" Southport officials to contact security officials at Elmira and request them to harass Gomez and search his cell on June 24, 2010 in retaliation.  He also alleges that a number of other actions, if not all actions, taken at Elmira were taken in retaliation for the grievances, complaints and Article 78 proceeding he had filed previously when he was at Southport.  (Complaint, ¶¶ 52, 78.)

---

[5]This incident is the gravaman of plaintiff's other lawsuit pending in this Court, Gomez and Padilla v. Fisher, et al., 11-CV-0476Sr, and involved a visit between Gomez and Olga Padilla where they were each accused of passing contraband to each other, the investigation that ensued and the suspension of Padilla's visitation privileges.

These alleged retaliatory actions are, for the most part, vastly different and unrelated, and include the following: the denial of a FOIL request for review of copies of all invoices and inventory records sold at the commissary from January 1, 2008 to July 10, 2010; the filing of a false misbehavior report by Correctional Officer Fusare following the June 24, 2010 cell search, which was ordered by Lt. Sepiol based on confidential information, charging plaintiff with possession of a weapon and a controlled substance; the deduction from Gomez's inmate account for the purchase of two belts that he did not receive because his purchase order and check were not mailed to the company initially;[6] the denial of an application by Gomez and his family, including Olga and Elizabeth Padilla, to participate in the Family Reunion Program, which was denied at Elmira and then forwarded to DOCCS's Central Office for a final determination where it appears to remain unresolved; the denial of Gomez's grievance--regarding the cell search and false misbehavior report--by Racette, Elmira Superintendent, based on an investigation by Correctional Officer Coveny; the finding of guilt on the weapons charge[7] by Livermore, Senior Counselor, who conducted the Superintendent's Hearing on

---

[6]Padilla had to reorder the belts for Gomez, and eventually Gomez's initial order and check were sent to the belt company and the belts ordered initially were received at Elmira and returned but Elmira only reimbursed Gomez $19.99 initially rather than the full $39.97. Gomez's grievance regarding the reimbursement was denied but he received $13.99 more which was still less than the total amount of the $39.97 deducted from his account. (Complaint, ¶ 59.)

[7]The possession of controlled substance charge was dismissed. (Complaint, ¶ 62.)

the misbehavior report and sentenced Gomez to nine months in SHU
and a loss of privileges; the affirmance of the Superintendent's
Hearing by Prack, Director of Inmate Discipline and Special
Housing; the denial of a grievance regarding Gomez being denied
the opportunity to attend his GED graduation and obtain a free
Dictionary and Thesaurus as a reward for passing the GED Test;
the move of Gomez and Olga Padilla from the contact visiting area
to a non-contact visit booth during a visit at Southport by
Padilla on April 4, 2011;[8] the removal of Gomez's handcuffs by
Schmitt before the April 4, 2011 visit in violation of security
procedures which Gomez "understood as an invitation" by Schmitt
to have Gomez engage in a physical confrontation with Schmitt;
the removal of Gomez and Padilla to a non-contact visit booth by
Correctional Officers Orioles, Cleary, Scmitt and Pedalty during
a visit on May 14, 2011; the denial of Gomez's grievance,
regarding the May 14, 2011 visit, by Sheahan, Southport's Acting
Superintendent, following an interview by Lt. Evans regarding the
grievance which Evans ended after Gomez refused to answer a
question relating to a different grievance; the requirement that
Gomez submit a FOIL request and pay $177.34 for a copy of the
video tape of the May 14, 2011 visit with Olga Padilla; the
submission, upon request by Gomez, of a copy of Olga Padilla's
visitor pass on May 14, 2011, which had Padilla's address and

---

[8]Gomez was transferred back to Southport on January 14, 2011. (Complaint,
¶ 206.)

seat location blotted out or covered in order to conceal the
original seat location where Gomez was moved from in order to be
placed in a non-contact visit booth; the denial of Gomez's
request that the names of the other visitors on May 14, 2011, be
disclosed based on a claim of confidentiality and failure to
resolve or address Gomez's appeal to DOCCS's Counsel's Office;
Gomez's move from a cell on "level 2," to one on "level 3," led
Correctional Officer Hodge to inform Gomez that he was not going
to remain on level 3 and would go to "level 1," and the next day
during a visit by Olga Padilla, Correctional Officer McGrain
searched Gomez's cell and fabricated a false misbehavior report
charging Gomez with violations of rules relating to the
unauthorized exchange and/or possession of another inmate's
disciplinary, grievance and criminal sentencing history material
or documents; Gomez's grievance related to the visit and cell
search was not filed by Von Hagn, Inmate Grievance Review
Committee ("IGRC") Supervisor, because she claimed it was
untimely, and Gomez's resubmitted grievance was not filed nor
responded to by Von Hagn; and the coercion of Gomez by Hearing
Officer Bartlett, Deputy Superintendent for Programs, Southport,
to plead guilty to the charges set forth in the misbehavior

report by telling Gomez that he would get "a lot" of time in SHU if he did not plead guilty.[9]   (Complaint, ¶¶ 53-78.)

Gomez was released from SHU at Southport on August 1, 2011 and transferred to Auburn.  He claims that as a consequence of the two retaliatory misbehavior reports he was denied parole on September 20, 2011, and held for another 24 months before his next Parole Board appearance.  (Id., ¶¶ 76-77.)  He alleges that

> As the evidence attached ... as Exhibits 1-176, and as described above, Defendants Sepiol, Muccigrosso, Fusare, Atwood, Rope, Coveny, Reynolds, Hughes, Racette, Livermore, McGrain, Hodge, Washburn, Hetrick, Sheahan, Evans, Pedalty, Orioles, Scmitt, Bartlett, Von Hagn, John Doe[s 1-5, CORC Members], Bellamy, and Prack were directly or indirectly involved in a conspiracy to retaliate against Gomez and Padilla for Gomez's exercising of his First and Fourteenth Amendment rights to petition the government for redress of grievance and for Padilla's support to Gomez, or condoned the retaliation and failed to take corrective actions upon learning of it through Gomez's grievances, complaints and appeals. . . .

(Id., ¶ 78.)

It is well established that prison officials may not retaliate against inmates for exercising their constitutional rights.  See, e.g., Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995); Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988).  To state a retaliation claim under § 1983, "a plaintiff must show that: (1) his actions were protected by the Constitution or federal law; and (2) the defendant's conduct complained of was in

---

[9]Bartlett sentenced Gomez to 120 days keeplock, 60 days suspended and 30 days loss of some commissary and telephone privileges.  (Complaint, ¶ 74.)

response to that protected activity." Friedl v. City of New
York, 210 F.3d 79, 85 (2d Cir. 2000) (internal quotation and
citation omitted).  As to the second prong, a prisoner alleging
retaliation must show that the protected conduct was "a
substantial or motivating factor" behind the alleged retaliatory
conduct.  See Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).
Evidence that can lead to an inference of improper motive
includes: (1) the temporal proximity of the filing of a grievance
and the alleged retaliatory act; (2) the inmate's prior good
disciplinary record; (3) vindication at a hearing on the matter;
and (4) statements by the defendant regarding his motive for
disciplining plaintiff.  See Colon, 58 F.3d at 872-73.

Because claims of retaliation are easily fabricated, the
courts must "examine prisoners' claims of retaliation with
skepticism and particular care," Colon, 58 F.3d at 872, requiring
"'detailed fact pleading . . . to withstand a motion to
dismiss.'" Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983)
(quoting Angola v. Civiletti, 666 F.2d 1, 4 (2d Cir. 1981)).  To
survive a motion to dismiss, such claims must be "'supported by
specific and detailed factual allegations,'" and not stated "'in
wholly conclusory terms.'" Friedl, 210 F.3d at 85-86 (quoting
Flaherty, 713 F.2d at 13); see also Graham, 89 F.3d at 79 (wholly
conclusory claims of retaliation "can be dismissed on the
pleadings alone"); Gill v. Mooney, 824 F.2d 192, 194 (2d Cir.

12

1987) (same).  Thus, "a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone [because i]n such a case, the prisoner has no factual basis for the claim . . . ."  _Flaherty_, _supra_.

Gomez's claims of retaliation are precisely the type that the Court is and must be skeptical of and must be dismissed. While there is no doubt that Gomez has pled a number of acts that he claims were taken in retaliation for grievances and complaints he had filed up to two years earlier while incarcerated at Southport, there are simply no facts that support his claims that the acts were taken in retaliation for those prior grievances and complaints.  As noted by the Court in a prior case filed by Gomez and Olga Padilla, in which they alleged similarly numerous claims of retaliation, "[t]he numerosity of plaintiffs' claims or instances of retaliation should not be mistaken for the sufficiency of such claims.  Gomez essentially claims that anything that occurred . . . that somehow negatively affected him or Padilla was retaliatory."  _Gomez, et al. v. Fischer, et al._, 11-CV-0476Sr (Docket No. 10, Order, at 39-40, filed March 29, 2013.)

Gomez claims that he believes ("upon information and belief"), that by serving a demand upon Andrew Cuomo, then New York Attorney General, relating to former Commissioner Fischer and former Southport Superintendent's Napoli's alleged failure to

comply with an order to disclose certain records,[10] he caused Southport officials to contact Elmira officials and request them to harass Gomez by ordering a cell search. This is precisely the type of conclusory, unsupported allegation that must be looked at skeptically and fails to state a claim for relief upon which relief can be granted. There are no non-conclusory allegations that support that this cell search and the other actions alleged in the complaint were done in retaliation for plaintiff's prior grievances and complaints, and an Article 78 proceeding related to a Freedom of Information of Law request. Simply stated, Gomez has not plead facts which support claims of retaliation that are plausible on their face. Ashcroft, 556 U.S. at 678. Accordingly, plaintiff's First Claim alleging retaliation must be dismissed with prejudice for failure to state a claim prejudice. See 28 U.S.C. ¶¶ 1915(e)(2)(B)(ii) and 1915A(b); see also Ellis v. Chao, 336 F.3d 114, 127 (2d Cir. 2003) ("[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile.") (citations omitted)).

2. Denial of Due Process at Disciplinary Hearing: December 9, 2010-January 4, 2011

Plaintiff alleges that defendant Livermore, the Hearing Officer assigned to the Superintendent's Hearing held in relation to the misbehavior report issued by defendant Fusare following a

---

[10]These records included videotapes and documents related to, in part, Padilla's visit with Gomez at Southport in June 2008. See n. 5, supra.

cell search on November 29, 2010 (Complaint, ¶¶61-62) denied him due process when she (1) denied Gomez the right to call witnesses and introduce relevant evidence, (2) failed to dismiss the weapons possession charge as untimely, (3) allowed a witness, defendant Atwood, to testify outside Gomez's presence, (4) did not provide Gomez a copy of the photograph of the weapon prior to the Hearing, and (5) was unfair and biased.  (Id.,¶ 81-130.)

Gomez alleges that Livermore refused to ask a number of questions of a number of witnesses that he had requested she ask, refused to call a witness (id., ¶¶ 83-91), and prior to the hearing refused to provide him a photocopy of the weapon found during the search because she said it was part of the Unusual Incident Report.  He claims the photocopy he was shown during the Hearing was not the same photocopy he later received pursuant to a FOIL request.  (Id., ¶¶ 92-93.)  Gomez also claims that, inter alia, Livermore relied on false testimony, lied to him when she denied that others were secretly supervising the Hearing and held the Hearing despite its untimeliness.  Livermore found Gomez guilty of possession of a weapon and sentenced him to nine months SHU confinement and loss of privileges.  (Id., ¶¶ 98-105.)  The appeal was denied by Prack on March 17, 2011.  (Id., ¶ 106.)

Plaintiff claims that defendants Sepiol, Muccigrosso, Fusare, Atwood, Reynolds, Wenderlich, Racette, Prack and Fischer are all liable for the due process violations alleged because

"they all were directly or indirectly involved in the events leading up to the conduct of the hearing or failed to take corrective action upon learning of the violations resulting in Gomez's confinement in SHU . . . ."  (Id., ¶ 121.)  Gomez alleges that: Lt. Sepiol was a principal actor causing the false misbehavior report to be issued; Correctional Officers Muccigrosso, Fusare and Atwood provided false testimony which Livermore relied on to find Gomez guilty; Wenderlich, Deputy Superintendent for Security, Racette, Superintendent, and Prack had the duty and obligation to insure that Gomez received due process and to review the determination and correct it; Correctional Officer Reynolds assigned Livermore to conduct the Hearing and thus is responsible for Livermore's violations of Gomez's rights; and Fischer, former Commissioner, who learned of the alleged violations by being served a copy of Gomez's Article 78 petition failed to correct the violations.

It is clear that filing a false misbehavior report or providing false testimony does not rise to the level of a constitutional violation and thus the claims against Sepiol, Muccigrosso, Fusare and Atwood alleging violations of Gomez's due process rights must be dismissed with prejudice.  *See* Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986) ("The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of

a protected liberty interest"), *cert. denied*, 485 U.S. 982, 108
S. Ct. 1273, 99 L.Ed.2d 484 (1988); Husbands v. McClellan, 957 F.
Supp. 403 (W.D.N.Y. 1997).  The only constitutional violation
that could occur in this situation is if plaintiff were not
provided adequate due process in any proceeding which is based
upon the misbehavior report.  In that case, the claim is not
based on the truth or falsity of the misbehavior report but
instead on the conduct of the hearing itself.

Plaintiff's claims against Wenderlich, Racette,  and Fischer
must also be dismissed because there are no allegations of their
personal involvement in the alleged due process violations at the
Hearing, *See* Woodward v. Mullah, 2009 WL 4730309, at *2 (W.D.N.Y.
Dec. 7, 2009) ("It is the well settled law of the Second Circuit
that a defendant must be personally involved in an alleged
constitutional deprivation for a court to award damages under §
1983[,]") (citing Provost v. City of Newburgh, 262 F.3d 146, 154
(2d Cir.2001)), but the due process claims against Livermore and
Prack will proceed to service.  *See* id., at *2-3 ((in reviewing
the split of authority among district courts in Second Court
regarding whether affirming a disciplinary hearing alone is
sufficient to allege personal involvement under 42 U.S.C. § 1983,
Magistrate Judge Jeremiah McCarthy noted that "while personal
involvement cannot be founded solely on supervision, liability
can be found if the official proactively participated in

reviewing the administrative appeals as opposed merely to
rubber-stamping the results.") (citing <u>Hamilton v. Smith</u>, 2009 WL
3199531, *22 (N.D.N.Y.2009), report and recommendation adopted as
modified, 2009 WL 3199520); <u>Odom v. Calero</u>, 2008 WL 2735868, *7
(S.D.N.Y.2008) ("The reference in case law to an official who
'fails to remedy' a violation logically applies only to ongoing,
and therefore correctable, constitutional violations-not to a
specific event that is later subject to formal review by
designated officials once the constitutional violation has
already concluded.").  At this stage in the litigation, the Court
cannot determine the extent of Prack's personal involvement in
affirming the Hearing Officer's disposition.

   3.  <u>Denial of Due Process at Disciplinary Hearing: June 8-
       10, 2011</u>

      Plaintiff alleges that defendant Sweeney, who was assigned
to be his inmate assistant for the disciplinary hearing in
relation to the May 28, 2011 Misbehavior Report charging him with
the unauthorized exchange and possession of another inmate's
disciplinary, grievance and criminal sentencing material or
documents (Complaint, ¶¶72) and defendant Bartlett, the Hearing
Officer, denied him his right to adequate inmate assistance and
due process when Sweeney refused to (1) obtain various
documentary evidence, including two contraband receipts
indicating that his cell has been searched previously and no
contraband had been found, and (2) interview an inmate witness

(id., ¶¶ 131-132, 134-135).   Gomez alleges that Bartlett denied him the right to: (1) a fair and impartial hearing; (2) call witnesses; and (3) introduce relevant and material evidence. (Id., ¶¶ 135-137.)

Gomez alleges that Bartlett denied him the right to call witnesses (id., ¶ 136) and that she coerced him to plead guilty to the charges when she stated to him during the Hearing: "Unless you make a deal with me and plea[d] guilty you are going to get a lot of time in the SHU.  I already got you.  You are guilty as charged.  So, it is up to you.  You can get out of the box [o]n August 1st or you can stay here and do the SHU time I am going to give you."  (Id., ¶ 137.)   Bartlett then imposed a penalty of 60 days keeplock, thereby extending Gomez's disciplinary confinement to a total of 306 days, and a 30 day loss of telephone and commissary privileges.  (Id., ¶ 137.)   Prack affirmed Bartlett's disposition.  (Id., ¶ 139.)   Plaintiff also alleges that he submitted a grievance detailing the statement by Bartlett at the Hearing, which was investigated by the Deputy Superintendent for Administrative Services and denied by Sheahan, Acting Superintendent, Southport.  (Id., ¶ 138; Exh. 78, A 171.)   His appeal to CORC was denied.  ((Id.)

Plaintiff claims that Sweeney, Bartlett, Sheahan, Prack and John Does 1-5 (CORC Members) violated his rights to due process.  (Id., ¶¶ 141-143.)   Because Sheahan and John Does 1-5 had no

personal involvement in the alleged denial of due process at the June 8-11, 2011 disciplinary hearing, the claims against them must be dismissed.  *See* Woodward, 2009 WL 4730309, at * 2 ("It is the well settled law of the Second Circuit that a defendant must be personally involved in an alleged constitutional deprivation for a court to award damages under § 1983."); *see also* Rogers v. Artus, 2013 WL 5175570, at *3 (W.D.N.Y., Sept. 11, 2013) (Curtin, D. J.) (review of prisoner's grievance by Superintendent pursuant to DOCCS's grievance procedures is insufficient to establish the requisite personal involvement) (quoting James v. Poole, 2013 WL 132492 (W.D.N.Y. Jan. 9, 2013); Brooks v. Chappius, 450 F.Supp.2d 220, 225-26 (W.D.N.Y.2006) ("[W]hile there is some authority from within this circuit that a supervisory official's denial of a grievance can suffice to show personal involvement, in general personal involvement will not be found unless "the supervisor's response is detailed and specific[.]") (citations omitted)).

The claims against Bartlett, Sweeney and Prack, however, may proceed to service at this time.  *See* Sims v. Artuz, 230 F.3d 14, 23-24 (2d Cir.2000) (aggregating separate SHU sentences for purposes of the Sandin inquiry when they constitute a sustained period of confinement); Sealey v. Giltner, 197 F.3d 578, 587-88 (2d Cir.1999) (aggregating two periods of SHU segregation).[11]

---

[11]The Court at this time makes no determination whether the 60 day keeplock disposition constituted an "atypical and significant" hardship under Sandin v. Conner, 515 U.S. 472, 484 (1995).  See also Torres v. Mazzuca, 246 F.Supp.2d 334 (S.D.N.Y. 2003) ("[I]t appears that the Second Circuit's post- Sandin decisions

4.   <u>Intentional Infliction of Emotional Distress, Cruel and
     Unusual Punishment and Abuse of Process</u>

Plaintiff alleges that Sepiol, Mucigrosso, Fusare, Atwood,
Livermore, Wenderlich and Hughes intentionally inflicted
emotional distress upon him and subjected him to cruel and
unusual punishment when they "us[ed] the legal process of issuing
a misbehavior report" charging him with possession of weapon,
which he claims he did not have in his cell at the time of the
cell search on November 29, 2010, and "utiliz[ed] the
disciplinary hearing process as a means of punishing him" in
violation of his constitutional rights for exercising his rights
to redress grievances.  This is essentially the same claim that
is raised in the First Claim (retaliation) and Second Claim (Due
Process) and arises from the alleged retaliatory cell search on
November 29, 2010, the misbehavior report issued following the
search and the resultant disciplinary hearing conducted by
Livermore.  Gomez alleges that after he was moved to SHU on
November 29, 2010, he was depressed and attempted to take his own
life by hanging himself but pulled himself "from the brink."
(Complaint, ¶ 144.)  He claims that he feared the defendants
would file criminal charges against him and that "[a]ll hopes of
keeping a clean disciplinary record, of being granted

---

are unanimous that **keeplock** confinements of sixty days or less in New York
prisons are not 'atypical hardship.' ") (Emphasis in original).

participation in [Family Reunion Program] . . . and of being
released on parole in September 2011 were lost." (Id., ¶ 145.)

To the extent plaintiff may be alleging state law tort
claims--viz., intentional infliction of emotional distress and
abuse of process--against the defendants they are barred from
consideration in this Court by N.Y. Correction Law § 24(1).   N.Y.
Correction Law § 24(1) provides:

> No civil action shall be brought in any court of the
> state, except by the attorney general on behalf of the
> state, against any officer or employee of the
> department, which for purposes of this section shall
> include members of the state board of parole, in his or
> her personal capacity, for damages arising out of any
> act done or the failure to perform any act within the
> scope of the employment and in the discharge of the
> duties by such officer or employee.

See Johnson v. New York State Department of Corrections, 2013 WL
5347468, at *2 (W.D.N.Y. Sept. 23, 2013) (Skretny, C.J.); see
also Baker v. Coughlin, 77 F.3d 12, 15 (2d Cir.1996) (this
section also prohibits review by a federal court exercising
pendent jurisdiction).

Section 24 "shields employees of a state correctional
facility from being called upon to personally answer a state law
claim for damages based on activities that fall within the scope
of the statute." Ierardi v. Sisco, 119 F.3d 183, 187 (2d Cir.
1997). "Instead, any claim for damages due to a state
correctional facility employee's action or inaction must be
brought in New York's Court of Claims as a claim against the

state." Johnson, 2013 WL 5347468, at 2 (citing N.Y. Correction
Law, § 24(2).

Plaintiff's reference to the Eighth Amendment in this claim,
without any allegations related specifically to the conditions of
his confinement during his period of time in SHU resulting from
the disposition of guilt and sentence of nine months SHU and loss
of privileges, is nothing more than a recasting of his due
process claims set forth in his Second Claim and address above,
Discussion, supra, at 14-18.)  Moreover, "'[n]ormal" conditions
of SHU confinement do not amount to an Eighth Amendment
violation." Hattley v. Goord, 2006 WL 785269, at *5-6 (S.D.N.Y.
March 27, 2006) (citing Shannon v. Selsky, 2005 WL 578943, at *6
(S.D.N.Y. Mar. 10, 2005) (normal SHU confinement conditions do
not violate the Eighth Amendment); Gulley v. Roach, 2004 WL
2331922, at *11 (W.D.N.Y. Oct. 15, 2004) (inmate "merely
subjected to normal SHU confinement" cannot establish an Eighth
Amendment claim); Dixon v. Goord, 224 F.Supp.2d 739, 748
(S.D.N.Y.2002)).[12]

---

[12]Plaintiff's allegations set forth in a different section of the complaint
that he was deprived of cold water on a few occasions while he was in SHU, which
increased the hot water pressure and made him unable to obtain cold water from
his sink (Complaint, p 115-117), even if they rose to the level of an Eighth
Amendment violation, see Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (the
conditions of confinement resulted in "unquestioned and serious deprivations of
basic human needs," and defendants acted with deliberate indifference), fail to
state a claim because plaintiff does not allege which correctional officers were
responsible for turning off his cold water. He does not allege that any of the
named defendants were personally involved in such alleged unconstitutional
conditions.

Accordingly, the Fourth Claim is dismissed with prejudice to the extent it alleges state law claims and Eighth Amendment claims against the defendants named in such claim--Sepiol, Mucigrosso, Fusare, Atwood, Livermore, Wenderlich and Hughes--but to the extent it alleges a conditions of confinement claim under the Eighth Amendment it is dismissed without prejudice to the filing of an amended complaint against the officers plaintiff claims turned off his cold water and thus allegedly deprived him of his basic human needs and acted with deliberate indifference. *See* Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) ("To demonstrate that conditions of his confinement constitute cruel and unusual punishment ... [inmate] must demonstrate that conditions of confinement result 'in unquestioned and serious deprivations of basic human needs,' [and] that the defendants imposed those conditions with 'deliberate indifference.'") (citations omitted)).

5. Denial of Access to Courts

Plaintiff alleges that defendants Sepiol, Muccigrosso, Fusare, Atwood, Rope, Coveny and John Does 1-5 (CORC Members) denied him access to the Court when during the cell search on November 29, 2010 his legal papers relating to two separate legal proceedings were taken. (Complaint, ¶¶ 150-158.) One was an Article 78 petition challenging the denial of his FOIL request for copies of commissary records (Complaint 57-58, 157), and the

24

second was an action under 42 U.S.C. § 1983 alleging that he was denied due process at a disciplinary hearing on December 13, 2007, when he was not allowed to call as a witness a representative of the company that manufactured the drug testing apparatus which was used to test his urine.  The test was positive for marijuana despite Gomez's claim that he did not use said drug.  (Id., ¶¶ 153, 155-156.)  Gomez claims the confiscation of these documents caused the limitation periods to expire on his actions before he could file them.  (Id., at ¶ 150.)

Plaintiff alleges that he had finished drafting the papers for his two lawsuits and placed them on his bed in their respective files when on November 29, 2010, Muccigrosso opened his cell gate and he saw six or seven officers running to his cell.  One of the officers, he now "has reason to believe" was Rope, ordered him to put his hands on the fence and Muccigrosso then directed the officers to place Gomez in the shower.  While Gomez was in the shower, Sepiol came on to the gallery and went to Gomez's cell.  Gomez was later taken directly from the shower to SHU.  (Id., ¶¶ 15-152.)  Gomez received his personal property in SHU on December 3, 2010, at which time he noticed the papers from the two lawsuits were missing, except for the first three pages of the Article 78 petition and copies of his FOIL papers and documents related to the December 13, 2007 disciplinary

hearing (the basis of the § 1983 lawsuit).  He claims he did not have access to all the papers until he was released from SHU in August 2011 and received his personal property at Auburn, where he was transferred.  (Id., ¶ 153.)

Plaintiff filed a grievance which Racette, Elmira Superintendent, denied based on what Gomez claims was a faulty investigation by Correctional Officer Coveny.  CORC Members, John Does 1-5, affirmed the denial of the grievance.  (Complaint, ¶ 154.)  As noted above, see Discussion, supra, at 19-20, a Superintendents's review of grievance pursuant to DOCCS's grievance mechanism is insufficient to establish personal involvement in the alleged constitutional violation.  Rogers, 2013 WL 5175570, at *3 (review of prisoner's grievance by Superintendent pursuant to DOCCS's grievance procedures is insufficient to establish the requisite personal involvement) (quoting James, 2013 WL 132492).  Moreover, the investigation of a grievance alone, is not sufficient to allege personal involvement in the underlying constitutional violation.  See also Jordan v. Fischer, 773 F.Supp.2d 255, 279 (N.D.N.Y.2011) (Defendant's failure to investigate grievance does not rise to level of personal involvement nor does it state a separate constitutional claim.); Green v. Herbert, 677 F.Supp.2d 633, 639 (W.D.N.Y. Jan. 5, 2010) (inmate's allegation that officer who was assigned to investigate his grievance conducted a biased, unfair

investigation dismissed because an inmate "'has no constitutional right to have his grievances processed or investigated in any particular manner' ") (quoting Shell v. Brzezniak, 365 F.Supp.2d 362, 379 (W.D.N.Y. April 21, 2005)). Accordingly, the claims against Racette, Coveny and John Does 1-5 are dismissed with prejudice. See Ellis, 336 F.3d at 127 ("[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile.") (citations omitted)).

A correctional facility must provide an inmate with meaningful access to the courts, Bounds v. Smith, 430 U.S. 817, 828 (1977), but the mere limitation of access to legal materials, without more, does not state a constitutional claim, as "'the Constitution requires no more than reasonable access to the courts.'" Jermosen v. Coughlin, 877 F. Supp. 864, 871 (S.D.N.Y. 1995) (quoting Pickett v. Schaefer, 503 F. Supp. 27, 28 (S.D.N.Y. 1980)). In order to state a constitutional claim of a denial of access to the courts, a plaintiff must make a showing that he has suffered, or will imminently suffer, actual harm; that is, that he was "hindered [in] his efforts to pursue a legal claim." Lewis v. Casey, 518 U.S. 343, 351 (1996). Accord Morello v. James, 810 F.2d 344, 347 (2d Cir. 1987).

Thus, plaintiff must show that he has suffered an actual injury traceable to the challenged conduct of prison officials. A plaintiff has not shown actual injury unless he shows that a

"nonfrivolous legal claim had been frustrated or was being impeded" due to the actions of prison officials. Lewis, 518 U.S. at 351-52. Assuming plaintiff's allegations to be true, as the Court must, the Court finds that, at this stage in the litigation, plaintiff's denial of access to the courts claim based on the confiscation of his legal documents should proceed to service against the officers allegedly involved in the cell search and confiscation of said documents--Sepiol, Muccigrosso, Fusare, Atwood and Rope.[13] See Richardson v. Dep't of Corr. of N.Y.S., 2011 U.S. Dist. LEXIS 103871, at *16-17 (S.D.N.Y. Sept. 13, 2011) ("[T]he injury requirement is satisfied by only certain types of frustrated legal claims, including direct and collateral attacks on an inmate's sentence, such as petitions for federal and state habeas relief, and civil rights claims challenging confinement conditions.") (citing Lewis, 518 U.S. 351-52).

6.   Interference with Mail, Privacy, and Freedom of Speech and Association

Plaintiffs allege that numerous defendants, including mail room employees at Southport, correctional officers, IGRC Members, CORC Members and supervisory officials at Southport, deliberately interfered with Gomez's incoming and outgoing mail, some of which was from or to Olga and Elizabeth Padilla. (Complaint, ¶ 160.)

---

[13]It may turn out that none of these defendants were the ones personally involved in the confiscation of Gomez's documents during the cell search and by allowing these claims to proceed and directing a response to them, the Court expresses no opinion as to whether plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

On January 11, 2011, Olga Padilla forwarded Gomez a letter at Elmira, which Gomez did not receive because on January 14, 2011, he was transferred to Southport.  On January 15, Padilla, after learning of the transfer, sent Gomez a letter at Southport. (Id., ¶ 161.)  At a visit on January 23, Padilla and Gomez learned that Gomez had not received the two letters, and Gomez sent a letter to a mail room employee at Elmira inquiring if anyone at Elmira recalled forwarding one or both letters to him at Southport.  Gomez was informed that "all mail has been forwarded to S'port if we had any at ECF."  (Id., ¶ ¶ 162-163.) On February 28, Southport's mail room processed Padilla's seond letter (January 15); the first letter (January 11) was never received by Gomez.  (Id., 164.)

    Gomez alleges, upon information and belief, that Southport's mail room staff (unnamed) turned over the January 15 letter to security staff "after which a decision was made to give that piece of mail to Gomez so they could attempt to find out what Padilla was talking about when, in her letter . . . she wrote . . . . 'What do you want me to do with those papers you sent me? Because you sent me those papers but you did not explain what it is that you want me to do with them. As soon as you receive this letter write me back and tell me and tell me what should I do with those papers so I would know[,]' which in turn gives rise to the inference, if not proof, that [Southport's] mail room and

security staff opened and read the letter Gomez wrote to Padilla on February 28, 2011, in response to her [January 15, 2011] letter before forwarding it to Padilla." (Complaint, ¶ 165.)

On May 5, 2011, Padilla sent Gomez some bankruptcy papers at Southport for him to review and determine what information should be included in her motion to proceed *in forma pauperis* in another civil rights action filed in this court. Gomez was notified by mail room staff that the papers had been confiscated because they contained "legal info not yours." On May 11, Gomez then wrote to Washburn, Senior Mail and Supply Clerk, requesting the papers be returned. On May 10, Padilla mailed additional bankruptcy papers to Gomez and a letter, which contained Padilla's weekly pay check and a completed motion to proceed *in forma pauperis*. Gomez was again informed that the mail room (Correspondence Unit) had confiscated these mailings because it contained legal information that was not his, but did not justify why it confiscated the letter to Gomez and Padilla's paycheck. (Id., ¶ ¶ 168-169, Exh. 104, A221.)

On May 16, 2011, Padilla forwarded Gomez a letter at Southport, the mail room confiscated it and it was never delivered it to Gomez. (Id., ¶ 170.) On May 31, 2011, Gomez submitted a grievance challenging the May 11, May 16 and May 17, 2011, confiscations. Defendants Post and John Doe 7, correctional officers assigned to IGRC, denied the grievance and

the appeal to Sheahan, Acting Superintendent, was denied. Gomez appealed to CORC but never received a copy of a decision. (Id., ¶ 171.)

Plaintiff had requested that mail room staff forward the confiscated mail and papers to Prison Legal Services but the request was denied on the basis that "[c]ontraband is not privileged in nature-Contraband is to be returned to the party that sent it. We cannot send it to a third party. Please resubmit for processing." (Id., ¶ 172.) Gomez then requested the mail be returned to Padilla. The bankruptcy papers were returned but the letter, copy of Padilla's pay check and motion to proceed in forma pauperis were not and no justification for that was provided. (Id. ¶ 173.) Padilla informed Gomez that she sent him letters on May 23 and 25, June 1 and 13, 2011, which he never received and no justification for their apparent confiscation by the mail room was provided. (Id. ¶ ¶ 174, 176-177.) Elizabeth Padilla told Gomez in a letter that she did not receive a letter Gomez had sent her on May 25, 2011. (Id., ¶ 175.)

Gomez filed a grievance related to these incidents on June 25, 2011, but defendant Von Hagn, IGRC Supervisor, refused to accept the grievance on grounds that it was untimely. Gomez grieved Von Hagn's action and defendants John Doe 6-9, correctional officers serving on the IGRC, denied the grievance

31

and Gomez appealed to the Superintendent.  When Gomez did not receive a decision on his appeal within 20 days, he appealed to CORC.  Von Hagn received the appeal and she and White, an IGRC Supervisor, informed Gomez that he had returned the grievance response form with the "No Appeal Necessary" box checked and thus no further action was taken and the appeal was not forwarded to CORC.  Gomez asserts that the grievance form stapled to Von Hagn and White's letter was forged by Von Hagn, White or an IRGC member.  Gomez claims he did not check the No Appeal Necessary box but rather checked the box indicating that he did not agree with the IGRC's response and wished to appeal.  (Complaint, ¶ ¶ 178-179.)

Plaintiffs name as defendants Washburn, Senior Mail Room Staff, Gray, Mail Room Staff, Bartlett, Deputy Superintendent for Programs, Sheahan, Acting Superintendent, Hetrick, Captain, Evans, Lt., Von Hagn and White, IGRC Supervisors, Post and John Does 6-9, IGRC Members, and John Does 1-5 (CORC Members), alleging an interference with their mail in violation of their First and Fourteenth Amendment rights.

An inmate has a First Amendment right to the free flow of his mail, both incoming and outgoing. <u>Procunier v. Martinez</u>, 416 U.S. 396 (1974); <u>Davis v. Goord</u>, 320 F.3d 346 (2d Cir. 2003); <u>Heimerle v. Attorney General</u>, 753 F.2d 10 (2d Cir.1985); <u>France v. Coughlin</u>, 1987 WL 10724 (S.D.N.Y.1987). In order to

accommodate this right, prison regulations restricting inmate
mail must be reasonably related to prison interests in security
and order. Procunier v. Martinez, 416 U.S. at 412; Heimerle, 753
F.2d at 12; see also Davidson v. Scully, 694 F.2d 50 (2d
Cir.1982); Wolfish v. Levi, 573 F.2d 118 (2d Cir.1978), rev'd in
part on other grounds sub nom. Bell v. Wolfish, 441 U.S. 520
(1979).

   "Restrictions on prisoners' mail are justified only if they
'further[ ] one or more of the substantial governmental interests
of security, order, and rehabilitation ...[and] must be no
greater than is necessary or essential to the protection of the
particular governmental interest involved.' " Davis, 320 F.3d at
351 (quoting Washington v. James, 782 F.2d 1134, 1139 (2d
Cir.1986) (internal citations and quotation marks omitted).
Greater protection is afforded to legal mail than to personal or
non-legal mail, and  greater protection is given to outgoing mail
than to incoming mail. Davis, 320 F.3d at 351 (citing Thornburgh
v. Abbott, 490 U.S. 401, 413 (1989); Washington, 782 F.2d at
1138-39; Davidson v. Scully, 694 F.2d 50, 53 (2d Cir.1982).

   It has been held that "as few as two incidents of mail
tampering could constitute an actionable violation (1) if the
incidents suggested an ongoing practice of censorship unjustified
by a substantial government interest, or (2) if the tampering
unjustifiably chilled the prisoner's right of access to the

33

courts or impaired the legal representation received."   <u>Davis</u>,
320 F.d at 351 (citing <u>Washington</u>, 782 F.2d at 1139). "Following
<u>Washington</u>, district courts have generally required specific
allegations of invidious intent or of actual harm where the
incidents of tampering are few and thus the implication of an
actionable violation is not obvious on its face."   <u>Davis</u>, 320
F.3d at 351 (citing <u>Cancel v. Goord</u>, 2001 WL 303713 at *6
(S.D.N.Y., Mar. 29, 2001) (dismissing claim where only two
incidents of tampering alleged and no other indications of a
continuing practice); <u>John v. N.Y.C. Dep't of Corrections</u>, 183
F.Supp.2d 619, 629 (S.D.N.Y.2002) (requiring plaintiff to allege
facts that show defendants acted with invidious intent and
plaintiff was harmed by the interference); <u>Hudson v. Greiner</u>,
2000 WL 1838324, at * 5 (S.D.N.Y. Dec.13, 2000) (same); <u>Johnson
v. Morton</u>, 1996 WL 518078, at *1 (E.D.N.Y. Aug. 26, 1996) (noting
that "[c]ourts have consistently applied <u>Morgan</u> [ <u>v. Montanye</u> ]
to dismiss suits by inmates alleging unconstitutional opening of
their legal mail without any showing of damages").

"[I]n order for an inmate to state a claim for interference
with incoming non-legal mail he must show a pattern and practice
of interference that is not justified by any legitimate
penological concern."   <u>Cancel</u>, 2001 WL 303713, *6 (citing <u>Rowe v.
Shake</u>, 196 F.3d 778, 782 (7th Cir.1999). Regulations limiting a
prisoner's right to send and receive non-legal mail " 'is valid

if it is reasonably related to legitimate penological interests.'
" Rodriguez v. James, 823 F.2d 8, 12 (2d Cir.1987) (quoting
Turner v. Safley, 482 U.S. 78, 89 (1987)).

Gomez alleges more than a few incidents of mail
interference, in this case confiscation of a incoming legal and
non-legal mail from Olga Padilla and a couple of pieces of
personal mail to and from him and both Olga and Elizabeth
Padilla.  With respect to the individuals allegedly involved in
the alleged confiscation of mail, Washburn and Gray, mail room
employees, the Court finds that the interference/confiscation of
the mail may proceed against them only.

With regard to the other defendants named in this claim--
Bartlett, Sheahan, Hetrick, Evans, Post, Von Hagn, Griffin,
Bellamy, John Does 6-9, and John Does 1-5--,the Court finds that
none of them are alleged to have been personally involved in the
alleged interference with Gomez's legal mail.  Sheahan is alleged
to have denied Gomez's grievance appeal on June 17, 2011.  As
noted above, a Superintendent's review of a grievance is alone
insufficient to allege personal involvement.  See, e.g., Rogers,
2013 WL 5175570, at *3 (review of prisoner's grievance by
Superintendent pursuant to DOCCS's grievance procedures is
insufficient to establish the requisite personal involvement)
(quoting James, 2013 WL 132492).  There are no allegations of
Bartlett's, Hetrick's nor Evans's role other than they were

35

supervisors and "condon[ed] the violation by failing to take corrective action . . . ." (Complaint, at ¶ 160.)   The others--Post and John Does 6-9 (IGRC Members), John Does 1-5 (CORC Members), and Von Hagn and White (IGRC Supervisors)--are alleged to either have denied the grievance in their role as IGRC Members or failed to consider (CORC Members) or process Gomez's grievances.   None of these allegations allege personal involvement in the alleged constitutional interference with plaintiffs' mail.   *See* Parks v. Lantz, 2012 WL 1059696, at *9 (D.Conn. March 28, 2012) (failure to respond or process grievances does not demonstrate personal involvement); Swift v. Tweddell, 582 F.Supp.2d 437, 445-46 (W.D.N.Y.2008) (citing cases) ("a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim."); Jordan, 773 F.Supp.2d at 279 (Defendant's failure to investigate grievance does not rise to level of personal involvement nor does it state a separate constitutional claim.)

Accordingly, this claim alleging a First Amendment interference with plaintiffs' mail may proceed against Washburn and Gray only,[14] but the claims against the other defendants must

---

[14] *See* Thornburgh v. Abbott, 490 U.S. 401, 407-08 (1989) (acknowledging that free citizens, such as inmate family members, journalists, and attorneys have a legitimate First Amendment interest in communicating with inmates); *see also* Massey v. Wheeler, 221 F.3d 1030, 1036 (7th Cir.2000)(describing Thornburgh's recognition of those with First Amendment interests in access to inmates).   By allowing plaintiffs' claims to go forward, the Court is expressing no opinion as to whether such a claim would survive a properly supported motion to dismiss or for summary judgment.

be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A for failure to state a claim upon which relief can be granted.

   7. <u>Denial of Right to File Grievances</u>

   This claim alleges that a number of defendants, again including both supervisory and non-supervisory correctional employees and IGRC and CORC Members, interfered with Gomez's right to file grievances when they "regularly and deliberately interfered with [his] right to petition the government for redress of government, freedom of speech, and to due process of law by refusing to file and process many of [his] grievances and their appeals." (Complaint, ¶ 182.) Gomez then proceeds to set forth a number of instances where defendants either failed to file or process grievances, denied grievances or upheld on appeal the denials of grievances. (<u>Id.</u>, ¶¶ 183-202.) For the following reasons, this claim is dismissed in its entirety with prejudice.[15]

   Grievance procedures are the internal procedures and requirements of DOCCS, and as such, prison inmates neither have a constitutionally protected right to a grievance procedure, *see, e.g.,* <u>Jones v. North Carolina Prisoners Labor Union</u>, 433 U.S. 119 (1977) (Burger, J., concurring) ("I do not suggest that the [grievance] procedures are constitutionally mandated."); <u>Adams v.</u>

_____

   [15]Plaintiff filed a similar claim in his other action, <u>Gomez v. Fischer</u>, 11-CV-0476Sc, and it too was dismissed for failure to state a claim upon which relief can be granted. (<u>Id.</u>, Docket No. 10, Order, at 51-52.)

Rice, 40 F.3d 72, 75 (4th Cir. 1994) (holding that "the Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state"), cert. denied, 514 U.S. 1022 (1995), nor, as a general rule, is there a federal right to have them properly administered, see Ramirez v. Holmes, 921 F.Supp. 204, 208 (S.D.N.Y. 1996). See also Green, 677 F.Supp.2d at 639 (inmate's allegation that officer who was assigned to investigate his grievance conducted a biased, unfair investigation dismissed because an inmate "'has no constitutional right to have his grievances processed or investigated in any particular manner' ") (quoting Shell v. Brzezniak, 365 F.Supp.2d 362, 379 (W.D.N.Y. April 21, 2005)). Shell, 365 F.Supp.2d at 369-70 ("inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures [do] not give rise to a cognizable § 1983 claim.") (citing Cancel, 2001 WL 303713, at *3).

Accordingly, this claim is dismissed in its entirety with prejudice.

8. Eighth Amendment: Denial of Meaningful Exercise

Plaintiff alleges that at Southport between January 14, 2011, and January 28, 2011 (14 days), and June 13, 2011 and July 12, 2011 (29 days), he was denied the right to meaningful exercise when he was placed in the exercise cage with mechanical

restraints.  He also claims that he had to wear the same
restraints for about six hours during visits with Olga Padilla on
January 22, June 25 and July 9, 2011.  (Complaint, ¶ ¶ 205-206.)
He claims that defendants Griffin, Sheahan, Hetrick, Evans,
Signor, Post, Evertts, John Doe 6, Deburgomaster, John Does 1-5,
and Bellamy are liable "directly, or by condoning the action[s]
by failing to take corrective action upon learning of the
violations and instead enforcing the practice . . . ."  (Id., ¶
205.)  Plaintiff claims the restraints were painful, caused
bruises on his wrists and waist, and that he had difficulty
eating snacks Padilla had purchased for him from the vending
machines because it was painful.  (Id., at ¶ ¶ 207-208.)

     Gomez filed a grievance on January 22, 2011, which
defendants Post and Evertts, acting as IGRC members, denied and,
because Gomez's appeal to the Superintendent went undecided for
20 days, he appealed to CORC.  When CORC did not respond, he
wrote to defendants Von Hagn and White, IGRC Supervisors,
requesting that his appeal be submitted to CORC.  He received no
response.  Gomez submitted another grievance on July 4, 2011,
after the second period of time when he was required to exercise
in restraints, and it was denied by defendants John Doe 6 and
Deburgomaster, acting as IGRC members.  The appeal to defendant

Hopkins, Acting Superintendent, Southport, was denied, as was his appeal to CORC by defendants John Does 1-6.[16]  (Id., ¶ 210-211.)

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment" on inmates, and this prohibition includes the infliction of "unnecessary and wanton" pain.  Gregg v. Georgia, 428 U.S. 153, 173 (1976).  The Second Circuit has held that prisoners possess an Eighth Amendment right to "some opportunity for exercise."  Williams v. Greifinger, 97 F.3d 699, 704 (2d Cir.1996); see also Dumpson v. McGinnis, 348 Fed.Appx. 658, 2009 WL 3259419, at *1 (2d Cir., 2009) (Summary Order) ("We have stated that an inmate has a right to some 'opportunity to exercise,' subject to a 'safety exception.' ").  "Interference with prisoners' recreation must be quite severe in order to state an Eighth Amendment claim."  DiBlasio v. Rock, 2011 WL 4478581, at * 18 (N.D.N.Y., Sept. 26, 2011) (citing Branham v. Meachum, 77 F.3d 626, 630-31 (2d Cir.1996); see also Branham, 77 F.3d at 630-31 (finding that keeping inmate on lockdown and "full

---

[16]CORC's affirmance of the denial of Gomez's grievance cites to DOCCS Directive No. 4933, 7 N.Y.C.R.R. § 305.3(c)(2)(ii) & (iii), which provides generally that all Level I inmates who have not completed the post adjustment period are to be restrained during exercise and visits.  (Complaint, Exh. 121, A 242.)  The initial denial and affirmance of the denial both cite to Southport's Orientation Manual that note that Level I inmates will remain in cuffs and waist chains during their entire period.  (Id., Exh. 119-120, A240-241.)  Inmates transferred to Southport are automatically placed in Level I, for at least a 30 day adjustment period.  Dumpson v. Goord, 2011 WL 4345760, at *1 (W.D.N.Y. Sept.15, 2011) (Siragusa, D.J.).  See also Directive No. 4933, 7 N.Y.C.R.R. § 305.3 and 305.4 (SHU inmates are permitted one hour of outdoor exercise daily and they may be placed under a restraint order by deputy superintendent of security.)

restraint" status without outdoor exercise for a period of approximately twenty-two days does not violate the Eighth Amendment); Gibson v. City of New York, 1998 WL 146688, *3 (S.D.N.Y. Mar.25, 1998) (denial of recreation for eight days in a sixty-day period and the opportunity to exercise on two consecutive days found not constitutionally actionable); Young v. Scully, 1993 WL 88144, at *5 (S.D.N.Y. March 22, 1993) (holding that Eighth Amendment was not violated when inmate was deprived of exercise for periods lasting several days); and Jordan v. Arnold, 408 F.Supp. 869, 876-877 (M.D.Pa.1976) (holding that Eighth Amendment not violated when inmates confined to special housing unit were allowed two hours of exercise per week).

In both Mitchell v. New York State Dept. of Correctional Services, 2012 WL 6204205, at *4-5 (W.D.N.Y. Dec. 12, 2012) (Telesca, D.J.) and Phelan v. Zenzen, 2012 WL 5420423, at *5 (W.D.N.Y., Nov. 6, 2012) (Siragusa, D.J.) this Court rejected similar claims.  In Mitchell, plaintiff alleged that he was forced to remain in mechanical restraints during recreation approximately 35-40 times while placed in the Level I category over the course of a number of years.  He also alleged that the restraints were "extremely tight" to the point that it caused him discomfort.  Judge Telesca held that the allegations failed to state a claim of cruel and unusual punishment and a denial of meaningful exercise in violation of the Eighth Amendment.

41

Id., 2012 WL 6204205, at *5.  In Phelan, Judge Siragusa dismissed claims alleging the denial of exercise in the prison yard for several weeks (June through September) as punishment for a disciplinary infraction.  Phelan, 2012 WL 5420423, at *5.  *See also* Gomez, et al., 11-CV-0476Sr (Docket No. 10, Order, at 40-43, filed March 29, 2013) (dismissing Gomez's claims alleging the same ones set forth herein).  This Court (Arcara, D.J.) also has upheld the use of restraints to shackle inmates during exercise.  *See* Dabney v. McGinnis, 2006 WL 1285625, at *5 (W.D.N.Y. May 9, 2006) (upholding use of restraint order to shackle inmate for exercise) (Report and Recommendation adopted by District Judge); Brown v. Coughlin, 1995 WL 643349, at *5 (W.D.N.Y., Oct. 13, 1995) (Elfvin, D.J.) ("This Court also concludes as a matter of law that being required to wear mechanical restraints in the manner required and during exercise periods does not constitute the unnecessary and wanton infliction of pain.") (citing Whitley v. Albers, 475 U.S. 312 (1985)).  Based on the foregoing, plaintiff's allegations that he was required to wear handcuffs and a waist chain during exercise and visits fail to state a claim of cruel and unusual punishment under the Eighth Amendment.

## CONCLUSION

For the reasons discussed above, the following claims are dismissed, in whole or in part as set forth herein, with prejudice pursuant to 28 U.S.C. § § 1915(e)(2)(B)(ii) and 1915A:

(1) First Claim (Retaliation), in its entirety; (2) Second Claim (Due Process: Disciplinary Hearing December 9, 2010 - January 4, 2011), as against defendants Sepiol, Mucigrosso, Fusare, Atwood, Reacette, Reynolds, Fischer and Wenderlich; (3) Third Claim (Due Process: Disciplinary Hearing June 8 - June 10, 2011, as against Sheahan; (4) Fourth Claim (Intentional Infliction of Emotional Distress, Abuse of Process and Cruel and Unusual Punishment), in its entirety, against each of the named defendants--Sepiol, Mucigrosso, Fusare, Atwood, Rope, Livermore, Hughes and Wenderlich, but plaintiff is granted leave to amend the complaint, if he wishes, against those unnamed correctional officers/employees who he claims turned off his cold water and deprived him of drinking water in violation of the Eighth Amendment only; (5) Fifth Claim (Access to Courts), as against John Does 1-5, Racette and Coveny; (6) Sixth Claim (Mail Interference), as against Bartlett, Sheahan, Hetrick, Evans, Post, Von Hagn, White, Griffin, John Does 1-5, John Does 6-9 and Bellamy; (7) Seventh Claim (Grievance Process), in its entirety; and (8) Eighth (Denial of Exercise and Mechanical Restraints), in its entirety.  The following claims will proceed to service by the United States Marshals Service at this time: (1) Second Claim (Due Process: Disciplinary Hearing December 9, 2010 - January 4, 2011) against Livermore and Prack only; (2) Third Claim (Due Process: Disciplinary Hearing June 6 - June 8, 2011) against

Bartlett, Sweeney and Prack only; (3) Fifth Claim (Access to Courts) against Sepiol, Mucigrosso, Fusare, Rope and Atwood only; (4) Sixth Claim (Mail Interference) against Washburn and Gray only.

### ORDER

IT HEREBY IS ORDERED, that the following claims are dismissed, in whole or in part, with prejudice, pursuant to 28 U.S.C. § § 1915(e)(2)(B)(ii) and 1915A: (1) First Claim (Retaliation), in its entirety; (2) Second Claim (Due Process: Disciplinary Hearing December 9, 2010 - January 4, 2011), as against defendants Sepiol, Mucigrosso, Fusare, Atwood, Reacette, Reynolds, Fischer and Wenderlich; (3) Third Claim (Due Process: Disciplinary Hearing June 8 - June 10, 2011, as against Sheahan; (4) Fourth Claim (Intentional Infliction of Emotional Distress, Abuse of Process and Cruel and Unusual Punishment), in its entirety, against each of the named defendants--Sepiol, Mucigrosso, Fusare, Atwood, Rope, Livermore, Hughes and Wenderlich, but plaintiff is granted leave to amend the complaint, if he wishes, against those unnamed correctional officers/employees who he claims turned off his cold water and deprived him of drinking water in violation of the Eighth Amendment only; (5) Fifth Claim (Access to Courts), as against John Does 1-5, Racette and Coveny; (6) Sixth Claim (Mail Interference), as against Bartlett, Sheahan, Hetrick, Evans,

Post, Von Hagn, White, Griffin, John Does 1-5, John Does 6-9 and

Bellamy; (7) Seventh Claim (Grievance Process), in its entirety;

and (8) Eighth (Denial of Exercise and Mechanical Restraints), in

its entirety;

FURTHER, that the Clerk of the Court is directed to

terminate defendants W. Hughes, Steven Racette, Raymond J.

Coveny, Patrick Griffin, Michael Sheahan, Harry Hetrick, Marc D.

MacGrain, Scott M. Hodge, Richard T. Orioles, Thomas Evans,

Douglas Reynolds, Sabrina Von Hagn, Elizabeth White, John Does 1-

14, Brian Fischer, Andrew S. Peralty, Karen Bellamy, Peter S.

Schmitt, Steve F. Post, Mark Deburgomaster, Steven Wenderlich,

Harold Graham, Signor and Steven J. Evertts as parties to this

action;

FURTHER, that the Clerk of the Court is directed to cause

the United States Marshal to serve copies of the Summons,

Complaint,[17] and this Order upon Virginia Livermore and Robert

Prack (Second Claim: Due Process, Disciplinary Hearing December

9, 2010 - January 4, 2011); Angela Bartlett, Paul Sweeney and

Prack (Third Claim: Due Process, June 6 -8, 2011 Hearing);

Stanley Sepiol, A. Mucigrosso, A. Fusare, Atwood and Rope (Fifth

Claim: Access to Court); and Kathleen Washburn and Jane Gray

---

[17]The Court notes that plaintiff's Appendix of Exhibits was manually filed only because it contains over 325 pages.  The Court, at this time, will not direct that each defendant be served with a copy of the Appendix of Exhibits and that upon service of the summons and complaint on the defendants, the New York State Attorney General's Office can contact the Clerk's Office and arrange for a copy of the Appendix to be prepared, if necessary.

(Sixth Claim: Mail Interference), without plaintiff's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in plaintiff's favor;[18]

FURTHER, the Clerk of the Court is directed to forward a copy of this Order by email to Michael Russo, Assistant Attorney General in Charge, Buffalo Regional Office <Michael.Russo@ag.ny.gov>;

FURTHER, that pursuant to 42 U.S.C. § 1997e(g)(2), the defendants are directed to respond to the complaint.

SO ORDERED.

S/ Michael A. Telesca

-----------------------------------------

MICHAEL A. TELESCA
United States District Judge

Dated:     April 9, 2014
           Rochester, New York

-----------------------------------------

[18]Pursuant to a Standing Order of Court, filed September 28, 2012, a defendant will have 60 days to file and serve an answer or other responsive pleading, see Fed.R.Civ.P. 12(a)-(b), if the defendant and/or the defendant's agent has returned an Acknowledgment of Receipt of Service by Mail Form within 30 days of receipt of the summons and complaint by mail pursuant to N.Y.C.P.LR. § 312-a.